**JULIUS AARON & SON v. JACKSON. ***
No. 4936.

Court of Appeal of Louisiana.
Second Circuit.
March 8, 1935.

*Rehearing denied April 3, 1935.

Melvin F. Johnson, Alex F. Smith, and Chas. L. Mayer, all of Shreveport, for appellant.

John G. Gibbs, of Natchitoches, for appellee.

MILLS, Judge.

Plaintiff is a partnership composed of Julius Aaron, Sr. and Jr., doing a mercantile and grocery business in the city of Natchitoches. Defendant, Joseph H. Jackson, a lawyer residing in Shreveport, is the owner of a plantation in Natchitoches parish, located on Cane river. The object of this suit is to recover the sum of $1,313.84 balance due on open account for supplies furnished defendant and his tenants on this place during the seasons of 1928, 1929, 1930, and 1931. Defendant does not deny liability for goods delivered during 1928 and through June, 1929, pleading payment, but disputes the correctness of the amount in so far as plaintiff has failed to allow a 10 per cent. discount alleged to have been agreed upon. He contests the subsequent account, alleging that he ceased doing business with plaintiff in June, 1929, has not purchased or authorized the purchase of any goods since, and expressly notified plaintiff that he would not be responsible for further advances.

Defendant filed an exception of vagueness to the allegations contained in article 5 of the petition, which reads: "Petitioner shows that the credit was extended to the defendant personally and charged to him under arrangements which the defendant made with plaintiff for the furnishing of supplies to defendant's tenants and relatives who were cultivating defendant's plantation situated near Natchitoches, Louisiana, for the defendant, and that monthly statements were mailed to the defendant and the above mentioned payments were made from time to time by the defendant, and that all payments made subsequent to the last purchase were made after a final statement had been furnished to the defendant."

Defendant asked to be informed when and where the alleged arrangements were made, by whom on behalf of defendant, and whether oral or in writing, and, if in writing, that the document be ordered filed. This exception was sustained as to whether the arrangement was oral or written, and, if written, plaintiff was ordered to attach the writing to the petition. Plaintiff answered that the arrangement was oral. As the arrangement was the very basis of the suit, defendant was clearly entitled to the particulars requested. It was hardly consistent to order the writing, if existent, to be attached to the petition, but refuse to order the details given, if oral. Defendant has protected his rights by an objection, made general, at the inception of the testimony, that the allegation quoted as to the arrangement is too vague to admit of proof. The overruling of this objection is clearly erroneous and so prejudicial to defendant in the preparation of his defense, that, if we find the judgment in favor of plaintiff justified only by evidence so admitted, we will have to remand the case for a new trial. As the case stands, not being favored with a written opinion, we are unable to determine whether or not defendant was held liable upon the express contract so indefinitely alleged, or upon an implied contract in support of which a great mass of testimony was admitted over the objection of defendant, appellant, that the suit was upon an express contract.

At the beginning of the 1928 season, Lee Jackson, a brother, was engaged by defendant as manager of the Cane river plantation, with full authority to make purchases in the name of defendant. In March he left and was succeeded by another brother, Fred, who ran the place for the rest of 1928 and through the season of 1929. Defendant had been purchasing his supplies from another concern, which allowed him a 10 per cent. discount on all goods purchased. He claims that he transferred his account to plaintiff upon its promise to make the same allowance. In June, 1929, a dispute arose, plaintiff contending that this discount was to be allowed only on shoes and dry goods. As a result, defendant ceased trading with plaintiff. The account filed corroborates this, as it shows an abrupt stoppage on June 12; no further entries appearing until November 13 of that year. Prior to June 12, purchases were made almost daily. Without taking the time and space to comment here upon all the details of the lengthy record, we will state that the testimony and exhibits satisfy us that the account up to June 12, 1929, has been paid, and that the real dispute is confined to that portion beginning in November, 1929. We are also satisfied that defendant did not authorize any purchases after that date, and did not make any payments intended to apply on the account after the remittance of a $500 check on March 4, 1930. A check for $250, sent in January, 1931, is shown to have been intended to pay for certain particular items, to wit: A note made

by a brother of, and indorsed by, defendant; and roofing materials which went into the house of defendant and for which plaintiff enjoyed a materialman's lien. Four small intervening payments are explained by defendant, and are shown not to have the effect of ratifying the disputed account.

The junior member of plaintiff firm is the only witness testifying to any express agreement with defendant. He testifies to an arrangement made in February, 1928, which, however, referred to the 1928 and 1929 crop years, liability for which is not disputed. Also, to one alleged to have been made in the fall of 1930, in regard to the renewal of the account which, if substantiated, is most important. His testimony on this point is so uncertain and unsatisfactory that its effect is outweighed by defendant's emphatic denial. Plaintiff can only hope to recover on an implied contract.

As stated, J. H. Jackson ran the place himself during 1928 and 1929. From 1930 on it was operated by lessees. Lee Jackson had farmed a place for Julius Aaron, Sr., but before Christmas of 1929 he left Aaron, leased and moved onto the Jackson place, for which he agreed to pay a rental of one-fourth of the crop. Beyond advancing Lee cash for the making of the crop, Joe Jackson took no part in the running of the place. During 1928 and 1929 he had made frequent trips to and maintained supervision over operations. After those years a changed family situation made this inconvenient and led to the leasing of the place.

The only arrangement that the younger Aaron testifies to is alleged to have been made in the fall of 1930, after the new account had run a year. Aaron admits that he had a conversation with J. H. Jackson, at the place, in the spring of 1930, but denies that on that occasion he was told by Joe Jackson that he would not be responsible for goods delivered after June, 1929. He also denies that Lee Jackson was present. Both Joe and Lee Jackson testify that on this visit Aaron was emphatically told by Joe that he would not be responsible for goods delivered after June, 1929. Joe Jackson testifies that he had not previously known that goods so delivered were being charged to him, and that his repudiation was immediate and unmistakable, and that he never thereafter assumed any responsibility for, and had no knowledge that, goods were being charged to him until this suit was filed. It would appear that this preponderance of the testimony would determine the case in favor of defendant, but there are further difficulties.

After November, 1929, when the account was reopened by plaintiff, both Lee and Fred Jackson delivered to it numerous written orders to let tenants on the Jackson place have goods and charge them to J. H. Jackson. It is not shown that the latter ever knew of, or authorized, these orders. Lee Jackson says that the account was carried in the name of J. H. Jackson at the suggestion of plaintiff; the reason given that it would simplify the bookkeeping. J. H. Jackson, who, in 1930 and 1931, was advancing his brothers what he thought was an amount sufficient to run the place, testifies that he was surprised and indignant to learn that they had incurred an indebtedness beyond this sum. In explanation of this additional expense, Lee Jackson says that, at the time, the price of cotton was high and that he thought the crop would be ample to take care of all indebtedness. Instead, the price declined disastrously. The crop in 1930 and in 1931 was sold and the proceeds applied upon J. H. Jackson's cash advances, failing by a considerable sum to offset them.

Another difficulty in the case is that, throughout the period, monthly statements were sent to J. H. Jackson without protest from him. Defendant admits the receipt of many letters, explaining that he thought the correspondence was about the disputed 10 per cent. allowance on the 1928 and 1929 account; that, having settled this to his own satisfaction, and not wishing to reopen the matter, he did not open the letters from plaintiff. This failure would be difficult to understand but for the fact that defendant produced the unopened letters in court and offered to file them in evidence if plaintiff desired. So this statement must be accepted with, perhaps, the justifiable comment that defendant is a better lawyer than business man. Defendant takes the legally correct position that, having once notified plaintiff to cease supplying the place at his expense, and the continuing account having stopped in June, 1929, he was under no duty to repeat that notice or further instruct plaintiff.

■■ We note from the minutes that this case was tried, intermittently, over a period from October, 1933, to February, 1934, making up a record of over 500 pages. It was decided below immediately after argument. While reluctant to disagree with a trial judge on a question of fact, after a careful study of the record and the voluminous briefs, we conclude that plaintiff has failed to make out its case; that it has failed to discharge the burden, imposed upon it by law, of proving by a clear preponderance of the evidence an express contract covering the period subse-

quent to 1929, and that any implication that might be drawn from the circumstances of this case and the conflicting testimony, conceding its admissibility under the pleadings, must yield to the proven, positive, contrary instruction of defendant. The only reasonable explanation of the extension of the unauthorized credit is that the members of plaintiff firm, like Lee Jackson, believed that the crop would protect their account.

The judgment appealed from is accordingly reversed, and plaintiff's demand rejected at its cost.